## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| Anne Elizabeth Alma Marks, as the Trustee for the next-of-kin of Ethan Daniel Marks, | Civ. No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** <br> **Jury Trial Demanded** <br> **Under FRCP 38(b)** |
| Benjamin Bauer, acting in his individual capacity as a Minneapolis Police Officer, | |
| Defendant. | |

_____

For her Complaint[1], Plaintiff Anne Elizabeth Alma Marks (Anne Marks), in her capacity as Trustee for the next-of-kin of Ethan Danial Marks (Ethan), states and alleges as follows:

1.   By order dated March 13, 2026, Hennepin County District Court Judge Rachna Sullivan appointed Ethan's mother, Anne Marks, as Trustee for the next-of-kin of Ethan Daniel Marks.  The Order and Consent are attached hereto as Exhibit A.

2.   This is an action for money damages for injuries sustained and suffered by Ethan as a result of the unreasonable use of deadly force on May 28, 2020 by Defendant

---

[1] Plaintiff acknowledges that this Complaint is related to Case Number 20-cv-01913 (PJS/DLM) and Plaintiff's Motion to Amend in that matter was taken under advisement by the Court on May 20, 2026.  This Complaint is filed and served out of an abundance of caution to ensure Plaintiff's rights are protected considering any potentially applicable statutes of limitations.  Plaintiff acknowledges that this Complaint may be rendered moot in the event she prevails on her Motion to Amend in Case Number 20-cv-01913 (PJS/DLM).  Plaintiff agrees that Defendant need not answer this Complaint until after that ruling is issued.

Benjamin Bauer ("Bauer") prior to his death.  Defendant Bauer violated Ethan's clearly established federal civil rights while acting under the color of state law.

3.     This is also an action for money damages for the wrongful death of Ethan, which occurred on March 10, 2026 as a result of the unreasonable use of deadly force by Defendant Bauer.

4.     Ethan's life and world were forever changed the moment Bauer shot him.

5.     Ethan suffered severe and permanent physical injuries including severe orthopedic injuries to his face and head; ocular blinding injuries which led to constant diplopia; injuries to his facial nerve which caused constant nerve pain; and a penetrating injury to his frontal lobe that caused oleoresin capsicum (OC) paste to enter his conjunctival fornices; and a traumatic brain injury.

6.     Ethan also suffered mentally—from PTSD and other mental and emotional injuries—because of being shot in the right eye and all that came as a result.

7.     The physical and mental toll of these multifaceted injuries resulted in Ethan's terrible addiction to fentanyl and other drugs.

8.     Ethan's substance abuse issues arose after several treatment options from his providers provided no long-term success for his physical and mental injuries.

9.     Ethan's post-shooting addictions caused his death on March 10, 2026— according to the Ramsey County Medical Examiner, Ethan's immediate cause of death was fentanyl toxicity.

10.    Ethan's autopsy was otherwise unremarkable.

11.     This cause of action arises purely out of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.  State-law claims and, by consequence, limitations and defenses under state law are not applicable to this civil rights lawsuit.

12.     Anne Marks is, and was at all times material herein, a citizen of the Unites States and a resident of the State of Minnesota.

13.     At the time Defendant Bauer shot him, Ethan was a 19-year-old college student and was 6 feet tall, weighing approximately 205 pounds.

14.     Defendant Bauer was, at all times material herein, a citizen of the United States, a resident of the State of Minnesota, and a duly appointed and acting officer of the Minneapolis Police Department.  He is sued in his individual capacity.

15.     Ethan originally brought this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3) and Anne Marks has been substituted in as Plaintiff to continue the same.  The aforementioned statutory and constitutional provisions confer original jurisdiction of the Court over this matter.

16.     The events giving rise to this action occurred in the City of Minneapolis. Venue is thus proper under 28 U.S.C. § 1391(b)(2).

### THE BACKDROP – THE MURDER OF GEORGE FLOYD BY MINNEAPOLS POLICE OFFICERS

17.     On May 25, 2020, just three days before the incident that is the subject of this lawsuit, George Floyd was killed by former Minneapolis police officer Derek Chauvin while three fellow former officers stood by and refused to intervene.

18.     Mr. Floyd was one of many tragic casualties of the Minneapolis Police Department's long history of racial bias and unchecked, unconstitutional use of force practices.

19.     The murder of Mr. Floyd was captured on video and was widely viewed, with horror and outrage.

20.     As such, the murder of Mr. Floyd sparked protests across the nation and calls to finally change systemic racism in our nation's police departments.

21.     Some of the protests nationwide, including in Minnesota and Minneapolis in particular, caused severe destruction.  But, most of this occurred during nighttime hours.

22.     During the daytime in Minneapolis, the vast majority of activity was peaceful and aimed at effecting change and restoration of the communities destroyed.

23.     But as was typical for the Minneapolis Police Department's heavy-handed tactics, the protests – peaceful or not – were met with force by the MPD, including the improper use of 40 mm blunt impact projectiles, and other supposedly "less lethal" munitions.

24.     Minneapolis Councilmember Steve Fletcher described on May 28, 2020 that the police had flipped the script on peaceful protesters and clean-up crews: "The community gathered Tuesday night to mourn and express their outrage, peacefully.  Tactical decisions by MPD shifted the dynamic of the crowd…to confrontation."

25.     Days prior to Ethan's injury, Minneapolis Councilmember Jeremiah Ellison described the same phenomenon.  Councilmember Ellison said: "The police always respond this way to crowds, and things get out of hand…And I don't know how the strategy doesn't

change.  And I'll tell you right now I've made calls requesting that the strategy change and it still has not."

26.    On May 26, 2020, another Minneapolis Councilmember denounced the police use of chemicals and projectiles.  Councilmember Andrew Johnson stated:  "What I saw from some of the scenes last night looked to be disproportionate and escalating force…It's extremely concerning, and we need answers and accountability for that."

27.    Over one year later the same sentiment exists as evidenced by Minneapolis Council President Lisa Bender's statement on June 17, 2021, including the following:  "There are too many instances of officers using force.  There's too many instances of officers not being disciplined in a way that leads to a shift in behavior, or to getting officers off the street."

28.    Certain areas of Minneapolis incurred more destruction in the protests than others.  The Wall Street Journal described the Longfellow neighborhood as "the epicenter of protests over the death of George Floyd."[2]

29.    Ethan and Anne were informed about a community clean-up in the Longfellow neighborhood via Facebook.

30.    In mid-afternoon on May 28, 2020, Ethan and Anne – a Registered Nurse – traveled to the Longfellow area, near the heavily damaged Target store located at 26th Avenue South and Lake Street, to assist other volunteers in clean-up efforts.  The clean-up was organized by MAD DADS and religious leaders.

31.    No curfew or other restrictions were in place in Minneapolis on May 28, 2020.

---

[2] https://www.wsj.com/articles/george-floyds-death-the-minneapolis-neighborhood-at-the-center-of-protests-1590774160

32. The first nighttime curfews in Minnesota were not announced until Friday, May 29.

33. In his Emergency Executive Order 20-67, Minnesota Governor Tim Walz imposed nighttime curfews in Minneapolis, St. Paul and surrounding communities for May 29-30, 2020.

34. As the Executive Order noted, "thousands of Minnesotans have expressed their frustration in a peaceful and constructive manner."

35. Ethan and his mother were such individuals and engaged in a peaceful clean-up for several daytime hours on May 28.  They were there for two messages: 1) to support the calls for systemic change by protesters; and 2) to support the neighborhood.

36. While areas shown by the media depict buildings ablaze and violence and chaos at each turn, video from the clean-up depicts an area very different.

37. Video from the May 28 clean-up depicts an area that was not chaotic.

38. Video from the May 28 clean-up depicts an area that was devoid of looting or people destroying property.

39. Instead, video from the clean-up depicts music playing and the sun shining, with people working together to restore the Longfellow neighborhood.  Several Minneapolis police officers were present as onlookers, with no body language suggesting they faced any threat from the clean-up crew.

40. Then, around 5:30 pm – everything changed – a number of Minneapolis police squad vehicles and officers urgently arrived at the area.  Whatever their reason, it was **wholly unrelated** to Ethan and his mother.

41.     Portions of the scene, as well as events leading up to and following the shooting of Ethan (including a portion of the shot itself), were captured on video by 9 News – Australia, which had sent a crew to Minnesota in the wake of the murder of Mr. Floyd. Australia and its inhabitants have been increasingly aware of and concerned about policing in Minneapolis in particular because of the murder of one of their own, Justine Maia Ruszczyk, by a Minneapolis police officer in 2017.

42.     Waves of MPD officers continued to arrive in the area, as depicted in the below stills from the video captured by the Australian news team:





8

## THE SHOOTING OF ETHAN

43.     On the Australian news video at approximately 8:26,[3] Ethan and Anne can be seen standing peacefully by as the MPD officer presence increased, as denoted by the red arrow below:



44.     At some point after the waves of officers swarmed the area, an individual went down and required medical attention.

45.     The individual requiring said medical attention was just south of where Ethan and Anne were standing at 8:26, depicted by the yellow arrow in the photograph in paragraph 42 and as noted in red on the map below:

---

[3] The timestamps referenced herein are from the video clip of the incident captured and aired on 9 News.  The times are elapsed times from the video play and are not references to the time of day.



46.    No one was rioting or throwing projectiles at the group surrounding the victim. This group included Officer Jonathon Pobuda and Defendant Bauer.

47.    Defendant Bauer was in the same area in full uniform and protective gear.

48.    Defendant Bauer was assigned to SWAT 1280 and acting as part of Strike Force Team One.

49.    Defendant Bauer was armed with a 40-millimeter optically-sighted "less-lethal" launcher. Bauer was equipped with various 40-millimeter direct-impact rounds and he had his weapon out and available for use in the time leading up to his shooting of Ethan.

50.    Prior to his arrival at the group surrounding the victim, Defendant Bauer had already fired his 40-millimeter launcher several times at unknown targets. Bauer started firing immediately after he exited an MPD van upon seeing an individual throwing an object.

51.    After firing several rounds, Bauer walked over to the area of the victim.

52.    Anne, being a Registered Nurse, wanted to provide aid to the victim.

53.     At approximately 8:46 on the 9 News video, Anne went to do so, peacefully, and informed the group – including several MPD officers – around the downed individual that she was a nurse.



54.     The below image from Pobuda's body worn camera ("BWC") shows Ethan standing by passively before Pobuda goes hands on with Anne Marks:



11

55. Pobuda's BWC shows Anne attempting to help the victim. In a nonconfrontational manner, she approached and told Pobuda, "I'm a nurse. Let me help."

56. Someone responded to Anne by referencing a "medic" and Anne said, "I don't see anybody."

57. During that interaction, Pobuda pushed Anne notwithstanding her expressed attempt to render aid without posing any threat to anyone at the scene.

58. Ethan passively stood by (as depicted in Paragraph 44) until he observed Pobuda pushing his mother as she attempted to help the victim.

59. Around 8:56 on the Australian news video, Ethan walked over to Pobuda as depicted below:



60. The scene depicted many officers standing passively by.

61. The scene was not chaotic.

62. The scene, as visually depicted, did not contain rioters or looters.

63. Ethan walked up to Pobuda and shouted, "Back up, bitch" at the officer.

64.    Ethan grabbed ahold of Officer Pobuda's baton and Pobuda responded by forcefully pushing Ethan backward.

65.    Pobuda's use of force created distance between himself and Ethan without injury to either person.

66.    Defendant Bauer then aimed and fired his weapon at Ethan's face.  At this point in time, Defendant Bauer's weapon was loaded with a 40-millimeter Direct Impact No. 6320 OC round.

67.    Ethan was struck in the right eye.

68.    The below image from Bauer's BWC[4] shows the shooting.  Bauer's 40-millimeter optically-sighted launcher is aimed at eye level.  Ethan is directly in front of him with dark colored pants:



---

[4] Despite the still frames from the BWC videos containing a "CONFIDENTIAL" designation, this Third Amended Complaint is not filed underseal in accordance with Magistrate Judge Micko's October 20, 2023 Order (Dkt. 157).

69.     The above image shows Bauer's right arm holding the weapon and Pobuda is seen between Bauer's right arm and the stock.  Clearly, there were several feet of separation between Pobuda and Ethan when Bauer used deadly force.

70.     Defendant Bauer shot Ethan in the face from point blank range.

71.     A cloud of OC smoke erupted due to the shot:



72.     Bauer's BWC captured an exchange between himself and a bystander immediately after he shot Ethan in the face.

73.     Below is an image from Bauer's BWC showing that bystander:



74. Immediately after the shooting the bystander shouted, "Hey, hey! That was point blank!" Bauer responded, "Yes."

75. The bystander then repeated "point blank" twice and announced that she captured this event on video.

76. Defendant Bauer later attempted to walk back his contemporaneous confession regarding the use of deadly force against Ethan after consultation with his attorney.

77. Defendant Bauer's initial report regarding his objectively unreasonable use of force followed the typical MPD reporting fashion for this post-George-Floyd-murder-period. His reporting injected drama into the event that simply did not exist and omitted critical facts, including his calculated decision to shoot Ethan in the face.

78. Defendant Bauer used deadly force against Ethan by shooting a 40-millimeter Direct Impact No. 6320 OC round directly into Ethan's face.

15

79. Defendant Bauer has not provided any statement or report regarding the incident that would justify the use of deadly force against Ethan.

80. Ethan posed no significant threat of death or serious bodily injury to Bauer, Pobuda, the other MPD officers on the scene, bystanders, or anyone else.

81. Ethan had done nothing to justify the use of substantial force against him, let alone deadly force.

82. No one, including Defendant Bauer, gave any warning to Ethan prior to deployment of his 40-millimeter launcher.

83. No one, including Defendant Bauer, gave any commands to Ethan prior to deployment of his 40-millimeter launcher.

84. In order to shoot Ethan with a 40-millimeter launcher, Defendant Bauer had to execute a series of volitional acts.

85. Defendant Bauer volitionally held the launcher in firing position, requiring his non-firing hand to hold the foregrip of the launcher and placing his firing hand on the pistol grip of the launcher.

86. Defendant Bauer volitionally moved the safety lever on the launcher from the "safe" position to the "fire" position.

87. When the safety lever of the launcher is in the "safe" position, the launcher is unable to be fired.

88. Defendant Bauer volitionally inserted his finger inside the trigger guard.

89. Defendant Bauer volitionally raised the launcher to shoulder height and aimed the weapon at his intended target – Ethan's face.

90. Defendant Bauer volitionally placed his finger on the trigger.

91. Defendant Bauer volitionally exerted sufficient trigger-pull pressure to fire the launcher loaded with a 40-millimeter Direct Impact No. 6320 OC round at Ethan.

92. Defendant Bauer volitionally fired at Ethan's face.

93. Defendant Bauer volitionally did so while Ethan and others were in close range – within several feet.

94. Ethan was struck in the right eye orbit and socket by a 40-millimeter Direct Impact No. 6320 OC round fired by Defendant Bauer and the explosion knocked him out of his shoes.

95. Ethan immediately fell to the ground and grabbed his face.

96. Defendant Bauer saw Ethan get hit in the face and saw him holding his face, but offered no aid of any kind to Ethan.

97. Ethan experienced the deflation of his globe and immediate vision loss in his right eye.

98. OC is designed to effect the respiratory system, not a subject's vision. It is designed to allow a subject to see after deployment so the subject can leave the area.

99. Ethan suffered a penetrating trauma to his eye.

100. A penetrating trauma is the most undesirable outcome for "less lethal" munition deployments. Penetrating trauma can be caused by several things including target distance and shot placement.

101. OC "paste" entered Ethan's fractured eye socket with the partial collapse of his globe and effaced the interior of the eyelids, as well as the socket.

17

102. At 9:05 on the video, Ethan – still covering his eye and in excruciating pain – hobbled to safety, away from Defendant Bauer who had just severely and permanently injured him:



103. Eventually, Anne located her son and realized the obvious and serious nature of Ethan's injuries.

104. MPD officers made no attempt to render aid to Ethan.

105. Instead, his mother and another nurse (a stranger) began providing aid.

106. Another stranger – a teenager and aspiring medical worker – heard pops and then was drawn to Ethan as he retreated from the police presence and to safety.

107. The teenager observed a significant amount of blood pouring from Ethan's head and face and she went to assist the two nurses.

108. Ethan was in obvious and acute medical distress.

109. Ethan was covered in the orange paste emanating from the OC round.

110.    Eventually, a good Samaritan located Ethan and his mother, who were loaded into his vehicle.  The good Samaritan then feverishly drove them to the Emergency Department at M Health Fairview.

## THE UNAUTHORIZED USE OF DEADLY FORCE

111.    Defendant Bauer's actions contravened MPD training regarding the use of the launcher and the chemical agent.

112.    Defendant Bauer's actions contravened MPD policies regarding the use of the launcher and the chemical agent.

113.    Defendant Bauer's actions contravened numerous pertinent manufacturer guidelines with regard to the use of the launcher.

114.    The applicable manufacturer guidelines, as well as MPD training and policies, mandate that the launcher is forbidden to be launched toward the face, neck, or head without deadly force authorization because engaging such regions of the body may result in permanent injury and/or death to the target.

115.    Defendant Bauer, in contravention of policies, training and manufacturer guidelines for the launcher, aimed and fired the launcher at Ethan's face while he was at point blank range.

116.    Defendant Bauer utilized objectively unreasonable force, and this was clearly established law as of May 28, 2020 in the United States of America.

## ETHAN'S INJURIES

117. Ethan presented to the West Bank Emergency Department, where he was evaluated emergently by Ophthalmology and brought to the operating room for immediate repair of his right eye globe rupture.

118. The OC "paste" that remained inside Ethan's eye affected those attending to him in the ER.

119. Ethan was then transferred to the East Bank and was admitted to the Trauma unit with the right globe rupture and the following additional injuries: right orbital floor fracture, nondisplaced right supraorbital fracture, nondisplaced right lateral orbit fracture, comminuted fracture of the right maxillary sinus and a minimally displaced nasal bone fracture.

120. Imaging depicting Ethan's severe injuries, including the complete orbital floor fractures and permanent damage to the retina and cornea, is shown below:



121.    Ethan also suffered a complex and difficult concussion.

122.    The treatment of his injuries was a long road —and included numerous surgeries such as the removal of stitches on the injured right globe, cornea surgery, repair of his multiple fractures, retina surgery, tear duct surgery, a surgery to repair his double vision, and additional globe surgeries, among others.

123.    Dr. Koozekanani of the University of Minnesota described Ethan's injuries as catastrophic and explained that he would most likely never regain vision in the eye—and he never did.

124.    Because of the entry of chemical irritants into the eye socket and the interior of the eyelids, Ethan had irritated eyelids for the rest of his life.

125.    A photograph depicting Ethan's external injuries shortly after the incident is included below:



126.    Ethan's face and eye remained physically different from what they looked like before he was shot, so much so that he did not even like to look at pictures of himself or look in the mirror.

127.    Further, Ethan's significant pain continued in many forms for the rest of his life.

128. Ethan's post-concussive symptoms continued for the rest of his life, despite his efforts including treatment with the concussion clinic at M Health.

129. Ethan's eye itself ached constantly for the rest of his life.

130. The combination of monocular vision and post-concussive symptoms was extremely difficult for Ethan.

131. Further, Ethan suffered from daily headaches, blurred vision, double vision, light sensitivity and the presence of a constant "black circle" in the center of what used to be his vision.

132. The combination of the changes to Ethan's vision and the pain made it difficult for him to focus and made him tire and frustrate quickly.

133. The May 28 incident took a large toll on Ethan's mental and emotional health, for which he sought counseling. He often had severe nightmares, flashbacks, negative reactions to sirens, and was more anxious, stressed, irritable, and tearful.

134. Further, the injuries, treatment, constant pain and suffering, and substance abuse forced Ethan to put his college education and employment on hold.

135. Additionally, Ethan had to constantly think about how to protect his one good eye. This was true even when doing mundane daily activities, such as driving, because being rear-ended is an event that could cause his fragile globe to rupture.

136. Ethan required shatter proof glasses or goggles to protect his injured eye during many activities.

137. Ethan remained limited in the activities he could engage in because he could not risk a left-eye injury.

138.   Ethan treated with Twin Cities Pain Clinic for his chronic pain, with little to no long-term success.

139.   Ethan also suffered mentally from being shot in the right eye.

140.   Ethan was initially diagnosed with adjustment disorder with mixed anxiety and depressed mood in December 2020.  He was later diagnosed with Post Traumatic Stress Disorder (PTSD).

141.   Ethan treated his mental health issues on and off throughout the remainder of his life, including with Dr. Sevenich, Andrea Grey, and the Minnesota Center for Psychology, among others.

142.   Despite treating his various injuries—both the physical and the emotional—Ethan continued to suffer greatly.

143.   As a result of his unmanageable, severe and chronic pain; his emotional injuries; and the medical introduction of narcotic prescription medication, Ethan engaged in self-medication and fell into illicit substance abuse.

144.   Ethan worked on and off throughout the remainder of his life to battle substance abuse issues.

145.   Ethan engaged in several substance abuse treatment programs from August 2022 through the time of his death.

146.   But Ethan oscillated between periods of sobriety and heavy drug use for the remainder of his life—the tragic but usual and customary cycle given the dismal treatment success rates for fentanyl abuse.

147.    During those times of Ethan's cyclical use of drugs, combined with his physical and mental injuries stemming from Bauer's May 28, 2020 shot, Ethan's ability to manage his emotions, impulsivity, and cognitive communication abilities were also greatly affected.

148.    The post-Bauer-shooting Ethan was a vastly different individual than was known to his friends and family before the shooting.

149.    Bauer's shooting of Ethan put Ethan's life on a very different and dangerous trajectory—one with significant hurdles that would be difficult for even a non-brain injured individual to overcome.

150.    After a period of sobriety from approximately September 2025 to March 2026, Ethan's return to illicit drugs on March 10, 2026 caused his death—as it so often does when fentanyl is involved.

## DAMAGES

151.    Anne Marks is entitled to recover the damages suffered by her son, Ethan, as a result of the May 28, 2020 shooting—including his immense pain and suffering from the time of the shooting up to his death and medical specials for his extensive treatment.

152.    Life as Ethan knew it changed due to the May 28, 2020 shooting.

153.    The injuries—described above—significantly and negatively affected each of the remaining days of Ethan's life—**5 years, 9 months, and 13 days** of immense pain and suffering.

154.    Further, Ethan incurred special damages prior to his death, totaling more than $297,000.00.

155. The tragic culmination of the impact of Bauer's shooting was Ethan's March 10, 2026 death.

156. As a result of his death, Ethan suffered a loss of future enjoyment of his life.

157. Anne Marks is also entitled to recover those damages for Ethan. *See Andrews v. Neer*, 253 F.3d 1052, 1063 (8th Cir. 2001) (discussing and adopting the damages approach from *Berry v. City of Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990) including compensatory damages such as medical and burial expenses, pain and suffering before death, loss of earnings, the victim's loss of consortium).

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS

#### *Plaintiff v. Defendant Benjamin Bauer*

158. Anne Marks realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

159. By the actions described above, Defendant Bauer, under color of state law, violated and deprived Ethan of his clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

160. Defendant Bauer subjected Ethan to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

161. As a direct and proximate result of the acts and omissions of Defendant Bauer, Ethan suffered injuries, was forced to endure great pain and mental suffering during his life, and eventually *died* as a direct and proximate results of Bauer's unconstitutional

26

conduct and his next-of-kin were thereby damaged in an amount to be determined by the jury.

162.    Punitive damages in an amount to be determined by the jury are available against Defendant Bauer and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

163.    Anne Marks is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 — including those incurred by Ethan while he was alive and prosecuting this case on his own behalf.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Anne Elizabeth Alma Marks prays for judgment as follows:

1.    That this Court find that Defendant Benjamin Bauer committed acts and omissions violating the Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.    As to Count I, a money judgment against Defendant Benjamin Bauer for compensatory damages and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest; and

3.    For such other and further relief as this Court may deem just and equitable.

Dated:  May 21, 2026                    **ROBINS KAPLAN LLP**


s/*Robert Bennett*
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Allen Slaughter Jr., #0301668
Lauren O. Roso, #0397306
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone:  612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
aslaughter@robinskaplan.com
lroso@robinskaplan.com

**Attorneys for Plaintiff Anne Elizabeth Alama
Marks**

28